1   Matthew L. Sharp, Esq.
    Nevada Bar No. 4746
2   **MATTHEW L. SHARP, LTD.**
    432 Ridge St.
3   Reno, NV 89501
    Phone: (775) 324-1500
4   Email: matt@mattsharplaw.com

5   *Counsel for Plaintiff*

6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF NEVADA**

8
    JORDAN JOHN WALK, Derivatively on
9   Behalf of Nominal Defendant DRAFTKINGS        Case No.:
    INC., F/K/A DIAMOND EAGLE
10  ACQUISITION CORP.,

11              Plaintiff,                         **VERIFIED SHAREHOLDER
                                                   DERIVATIVE COMPLAINT
12  v.                                             AND DEMAND FOR TRIAL
                                                   BY JURY**
13  JASON ROBINS, HARRY EVANS SLOAN,
    MATTHEW KALISH, PAUL LIBERMAN,
14  WOODROW H. LEVIN, SHALOM
    MECKENZIE, JOCELYN MOORE, RYAN
15  R. MOORE, VALERIE MOSLEY, STEVEN
    J. MURRAY, HANY M. NADA, JOHN S.
16  SALTER, MARNI M. WALDEN, JASON K.
    PARK, JEFF SAGANSKY and ELI BAKE,
17
                Defendants,
18
    and,
19
    DRAFTKINGS INC. F/K/A DIAMOND
20  EAGLE ACQUISITION CORP.,

21              Nominal Defendant.

22

23          Plaintiff Jordan John Walk ("Plaintiff"), by and through his undersigned attorneys, brings this

24  derivative complaint for the benefit of nominal defendant DraftKings Inc. f/k/a Diamond Eagle

25  Acquisition Corp. ("DraftKings" or the "Company"), against its Board of Directors (the "Board") and

26  certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and

27  violations of federal law.  Plaintiff's allegations are based upon his personal knowledge as to himself

28  and his own acts, and upon information and belief, developed from the investigation and analysis by

                                                 1

Plaintiff's counsel, including a review of publicly available information, including filings by DraftKings with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by DraftKings' directors and officers in their management and control of the Company from December 23, 2019 through June 15, 2021 ("Relevant Period").

2.      DraftKings operates as a digital sports entertainment and gaming company in the U.S. It operates through two segments: (1) Business-to-Consumer and (2) Business-to-Business.   The Company provides users with daily sports, sports betting, and iGaming opportunities.   It is also involved in the design, development, and licensing of sports betting and casino gaming platform software for online and retail sportsbook, and casino gaming products. The Company distributes its product offerings through various channels, including traditional websites, direct app downloads, and direct-to-consumer digital platforms.

3.      DraftKings was incorporated in Nevada as DEAC NV Merger Corp., a wholly owned subsidiary of its legal predecessor, DEAC, a special purpose acquisition company, or SPAC.  On April 23, 2020, DEAC consummated transactions contemplated by a Business Combination Agreement (the "Business Combination") dated December 22, 2019, as amended on April 7, 2020, and, in connection therewith: (i) DEAC merged with and into the Company, whereby the Company survived the merger and became the successor issuer to DEAC; (ii) the Company changed its name to "DraftKings Inc."; (iii) the Company acquired DraftKings Inc., a Delaware corporation ("Old DK"), by way of a merger; and (iv) the Company acquired all of the issued and outstanding share capital of SBTech (Global) Limited ("SBTech").  Upon consummation of the preceding transactions, Old DK and SBTech became wholly owned subsidiaries of the Company.

4.      Throughout the Relevant Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) SBTech had a history of unlawful operations; (ii) accordingly, DraftKings' merger with SBTech exposed the Company to dealings in black-market gaming; (iii) the

foregoing increased the Company's regulatory and criminal risks with respect to these transactions; (iv) as a result of all the foregoing, the Company's revenues were, in part, derived from unlawful conduct and thus unsustainable; (v) accordingly, the benefits of the Business Combination were overstated; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On June 15, 2021, Hindenburg Research ("Hindenburg") published a report, alleging that the Company's merger with SBTech exposed DraftKings to dealings in black-market gaming. Citing "conversations with multiple former employees, a review of SEC and international filings, and inspection of back-end infrastructure at illicit international gaming websites," Hindenburg alleged that "SBTech has a long and ongoing record of operating in black markets," estimating that 50% of SBTech's revenue is from markets where gambling is banned."

6.     Following publication of the Hindenburg report, the Company's stock price fell $2.11 per share, or 4.17%, to close at $48.51 per share on June 15, 2021.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint alleges a violation of federal law.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

4.     Plaintiff Jordan John Walk purchased shares of DraftKings stock and continues to hold his DraftKings stock currently.

///

///

3

**Nominal Defendant**

5.      Nominal Defendant DraftKings is a Nevada corporation with principal executive offices located at 222 Berkeley Street, 5th Floor, Boston, Massachusetts 02116.

**Director Defendants**

6.      *Defendant Jason D. Robins* ("Robins") has served as DraftKings' Chief Executive Officer ("CEO") and Chairman of the Board since the consummation of the business combination.  For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Robins received $236,833,375 million in compensation from the Company, which was comprised of $650,000 in salary, $2,980,000 in bonus, $231,178,101 in stock awards, $1,950,000 in nonequity incentive plan compensation, and $75,274 in all other compensation.  For the fiscal year ended December 31, 2019 (the "2019 Fiscal Year"), Defendant Robins received $4,439,689 in compensation from the Company, which was comprised of $400,000 in salary, $3,239,689 in option awards, $800,000 in non-equity incentive plan compensation.

7.      *Defendant Harry Evans Sloan* ("Sloan") is the Vice Chairman of the Board.  Defendant Sloan was a founding investor of DEAC and has served as a director of DraftKings since the Merger.  Defendant Sloan also beneficially owned 2,742,130 shares of the Company's Common Stock as of March 1, 2021.  For the 2020 Fiscal Year, Defendant Sloan received $375,445 in compensation from the Company, which was comprised entirely of stock awards.

8.      *Defendant Matthew Kalish* ("Kalish") is President of DraftKings North America and has served as a director of DraftKings since the Merger.  Defendant Kalish also served as a director of Old DK from its inception until the Merger.  For the 2020 Fiscal Year, Defendant Kalish received $197,235,333 in compensation from the Company and Old DK, which was comprised of $425,000 in salary, $1,500,000 in bonus, $194,210,935 in stock awards, $1,062,500 in non-equity incentive plan compensation, and $36,898 in all other compensation.  For the 2019 Fiscal Year, Defendant Kalish received $2,114,748 in compensation from Old DK, which was comprised of $300,000 in salary, $1,326,348 in option awards, $480,000 in non-equity incentive plan compensation, and $8,400 in all other compensation.

///

9. During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kalish sold 57,692 shares of common stock at an artificially inflated price for proceeds of $3,110,175.

10. **Defendant Paul Liberman** ("Liberman") is a cofounder of Old DK and currently serves as DraftKings' President of Global Technology and Product. Additionally, he has served as a director since the Merger, during which time he also served as a member of the Compliance Committee. For the 2020 Fiscal Year, Defendant Liberman received $197,220,479 in compensation from the Company and Old DK, which was comprised of $425,000 in salary $1,500,000 in bonus, $194,210,935 in stock awards, $1,062,500 in non-equity incentive plan compensation, and $22,044 in all other compensation. For the 2019 Fiscal Year, Defendant Liberman received $2,139,948 in compensation from Old DK, which was comprised of $300,000 in salary, $1,350,348 in option awards, $480,000 in non-equity incentive plan compensation, and $9,600 in all other compensation.

11. Further, during the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Liberman sold 85,000 shares of Company stock for proceeds of $4,574,700 at artificially inflated prices.

12. **Defendant Woodrow H. Levin** ("Levin") has served as a director of DraftKings since the Merger and served as a director of Old DK from December 2013 to April 2020. For the 2020 Fiscal Year, Defendant Levin received $375,893 in compensation from the Company, which was comprised entirely of stock awards.

13. **Defendant Shalom Meckenzie** ("Meckenzie") is the founder of SBTech. Defendant MecKenzie served as a director of Old DK from December 2013 until April 2020 and has been a director of DraftKings since the Merger. For the 2020 Fiscal Year, Defendant Meckenzie received $373,618 in compensation from the Company, which consisted entirely of stock awards. During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Meckenzie sold on October 9, 2020, 6,949,088 shares of Company stock for proceeds of $353,222,143 and on January 21, 2021, 660,000 shares of Company stock for proceeds of $34,181,400 at artificially inflated prices.

14.     **Defendant Jocelyn Moore** ("J. Moore") has served as a director of DraftKings since her appointment on September 23, 2020.  Defendant J. Moore joined the Compliance Committee after the 2021 Annual Meeting.   For the 2020 Fiscal Year, Defendant J. Moore received $199,979 in compensation from the Company, which was comprised entirely of stock awards.

15.     **Defendant Ryan R. Moore** ("R. Moore") served as a director of Old DK from February 2012 until April 2020 and has been a director of DraftKings' Board since the Merger. For the 2020 Fiscal Year, Defendant R. Moore received $376,790 in compensation from the Company, which was comprised entirely of stock awards.

16.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant R. Moore sold 1,000,000 shares of Company stock for proceeds of $50,830,000 at artificially inflated prices.

17.     **Defendant Valerie Mosley** ("Mosley") has served as a director of DraftKings since her appointment on September 23, 2020, when she joined the Audit Committee. For the 2020 Fiscal Year, Defendant Mosley received $199,979 in compensation from the Company, which was comprised entirely of stock awards.

18.     **Defendant Steven J. Murray** ("Murray") served as a director of Old DK from August 2016 until April 2020 and has been a director of DraftKings and a member of the Company's Audit Committee since the Merger.  For the 2020 Fiscal Year, Defendant Murray received $378,136 in compensation from the Company, which was comprised entirely of stock awards.

19.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Murray sold 1,545,924 shares of Company stock for proceeds of $78,579,316 at artificially inflated prices.

20.     **Defendant Hany M. Nada** ("Nada") served as a director of Old DK from August 2016 until April 2020 and has been a director of DraftKings and a member of the Company's Audit Committee since the Merger.   For the 2020 Fiscal Year, Defendant Nada received $394,656 in

///

compensation from the Company, which was comprised of $378,585 in stock awards and $16,071 in all other compensation.

21.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Nada sold 946,712 shares of Company stock for proceeds of $48,121,370 at artificially inflated prices.

22.    **Defendant John S. Salter** ("Salter") served as a director of Old DK from August 2014 until April 2020 and has been a director of DraftKings and a member of the Company's Compliance Committee since the Merger.  For the 2020 Fiscal Year, Defendant Salter received $389,836 in compensation from the Company, which was comprised of $376,342 in stock awards and $13,494 in all other compensation.

23.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Salter sold 4,972,572 shares of Company stock for proceeds of $252,755,834 at artificially inflated prices.

24.    **Defendant Marni M. Walden** ("Walden") has been a director of DraftKings and a member of the Company's Compliance Committee since the Merger.   For the 2020 Fiscal Year, Defendant Walden received $375,445 in compensation from the Company, which was comprised entirely of stock awards.

25.    Defendants Robins, Sloan, Kalish, Liberman, Levin, Meckenzie, J. Moore, R. Moore, Mosley, Murray, Nada, Salter and Walden are herein referred to as the "Director Defendants."  Because of their positions with the Company, they possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Director Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Director Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false.

**Other Defendants**

26.     ***Defendant Jason K. Park*** ("Park") has served as DraftKings' Chief Financial Officer ("CFO") since the consummation of the Business Combination.

27.     ***Defendant Jeff Sagansky*** ("Sagansky") served as DEAC's CEO and Chairman until the consummation of the Business Combination.

28.     ***Defendant Eli Baker*** ("Baker") served as DEAC's CFO and President until the consummation of the Business Combination.

29.     The Director Defendants and Defendants Park, Sagansky and Baker are collectively referred to herein as "Defendants".

## THE AUDIT COMMITTEE CHARTER

30.     The Audit Committee Charter requires that the Audit Committee oversee significant financial reporting issues and internal audit controls and procedures.  The Audit Committee Charter provides:

> The Audit Committee shall have the duty and power to advise management, the internal auditing department and the independent auditors that they are expected to provide to the Audit Committee a timely analysis of significant financial reporting issues and practices and significant internal audit controls and procedures.

31.     Among other things, the Audit Committee Charter tasks the Audit Committee with discussing with independent auditors and management: (1) "the quality of the financial statements," (2) "the clarity and adequacy of the Corporation's financial disclosures," (3) "the adequacy of the Corporation's system of internal accounting controls," and (4) "the performance of the independent auditors."

32.     The Audit Committee Charter requires the Audit Committee to closely review quarterly and annual reports:

> The Audit Committee shall review any other financial statements or reports, as requested by management or determined by the Audit Committee, which are required to be filed with any Federal, State or local regulatory agency prior to filing with the appropriate regulatory body. As a part of such review, the following illustrates, but is not an exhaustive list of, the topics which may be covered: (a) the accounting principles employed in reporting any large or unusual transactions and the possible need to make specific disclosures of material developments, (b) developments in accounting policies and procedures since the previous filing of such financial statement or report and the effect of these developments may have on the Corporation's financial reporting, and (c) significant fluctuations in financial statement balances, ratios or statistics.

33. The Audit Committee Charter also requires that the Audit Committee perform the following functions:

(a) conduct or authorize investigations into any matters within the Audit Committee's scope of responsibilities. The Audit Committee shall be empowered to retain independent counsel and other professionals to assist in the conduct of any investigation in consultation with the Chief Legal Officer of the Corporation;

(b) *review legal and regulatory matters that may have a material impact on the financial statements, related company compliance policies, and programs and reports received from regulators*;

(c) establish procedures for the (i) receipt, retention, and treatment of complaints received by the Corporation regarding accounting, internal accounting controls, or auditing matters and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters;

(d) *discuss the Corporation's policies with respect to risk assessment and risk management, and review contingent liabilities and risks that may be material to the Corporation*;

(e) prepare a report each year for inclusion in the Corporation's proxy statement;

(f) review and discuss earnings press releases prior to public disclosure; and (g) review, approve, ratify or rescind related person transactions pursuant to the Corporation's Related Person Transactions Policy. [Emphasis added].

34. In violation of the Audit Committee Charter, the Audit Committee failed to conduct oversight of the Company's financial statements, the performance of the Company's internal audit function and independent auditors, and the Company's compliance with legal and regulatory requirements. As a result, the Company continued to engage in the Illicit Operations.

35. Defendants violated the Code of Ethics, the Code, the Compliance Committee Charter, and the Audit Committee Charter by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. Moreover, seven of the Defendants violated the Code by selling Company shares at inflated prices for aggregate proceeds in excess of $825 million

///

## THE COMPLIANCE COMMITTEE CHARTER

36.     The Company's Compliance Committee Charter, adopted contemporaneously with the consummation of the Merger, provides:

> The Committee, to the extent the Board deems necessary or appropriate, shall have the full power and authority to carry out the following primary responsibilities or to delegate such power and authority to one or more subcommittees of the Committee:
>
> 1.  *Laws and Regulations Review.* **Identify, review and analyze non-financial laws and regulations applicable to the Corporation and its business, and identify, review and analyze risk factors with regard to such laws and regulations that may impact the Corporation or its business. The Committee shall also have the** primary responsibility of reviewing, evaluating and recommending actions, policies or procedures to the Board that will help the Corporation remain in compliance with such laws and regulations. The Committee shall also have the primary responsibility of reviewing and evaluating the Corporation's current and prospective compliance efforts.
>
> 2.  *Compliance Programs and Monitoring.* Monitor the Corporation's efforts to implement compliance programs, policies and procedures that comply with local, state and federal laws, regulations and guidelines, respond to various compliance and regulatory risks facing the Corporation and support lawful and ethical business conduct by the Corporation's employees.
>
> 3.  *Risk Area Review.* **Review significant non-financial compliance risk areas, as identified by management, and the steps management has taken to monitor, control and report such compliance risk areas**.
>
> 4.  *Program Assessment.* Discuss with management on a periodic basis the adequacy and effectiveness of the Corporation's policies and procedures to assess, monitor, and manage non-financial compliance business risk, and legal, ethical and regulatory compliance programs (the "Programs").
>
> 5.  *Programs Assessment.* Monitor compliance with the Programs, authorize waivers of the Programs in accordance with the terms thereof, investigate any alleged breach or violation of the Programs, enforce the provisions of the Programs and review the Programs periodically and recommend changes, if any, to the Board for approval.
>
> 6.  *Noncompliance Investigation.* Oversee the investigation of, and request the investigation of, any significant instances of noncompliance with laws or the Corporation's compliance programs, policies or procedures, or potential compliance violations that are reported to the Committee.
>
> 7.  *Procedure Review.* Review the Corporation's procedures for the receipt, retention and treatment of complaints received by the Corporation regarding nonfinancial compliance matters and for the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable non-financial compliance matters.
>
> 8.  *Reporting to the Board.* The Committee, through the Chairperson, shall report at least annually to the Board, on the Committee's activities, findings and recommendations, including the results of any evaluations.

9. *Charter Review*. Review the Committee's Charter from time to time and recommend any proposed changes to the Board.

10. *Additional Duties*. Perform any other duties or responsibilities expressly delegated to the Committee by the Board from time to time.  [Emphasis added].

37.     In violation of the Compliance Committee Charter, the Compliance Committee failed to ensure that the Company's SBTech subsidiary was acting in compliance with applicable laws, and instead allowed SBTech to continue engaging in the Illicit Operations, particularly through its "distributor" entity BTi/CoreTech. To the extent the Board did not deem it "necessary or appropriate" to grant the Compliance Committee full exercise of the powers enumerated in the Compliance Committee Charter, the violations of the Compliance Committee Charter alleged herein are attributable to the Board, as well.

## THE COMPANY'S CODE

38.     The Company's Code, adopted contemporaneously with the consummation of the Merger, states that "each of our directors, officers and other employees are bound by this Code of Business Ethics." It states:

Each person agrees that he or she will:

•     Engage in honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

•     Produce full, fair, accurate, timely and understandable disclosure in reports and documents that we file with or submit to the Securities and Exchange Commission and in other public communications we make;

•     Comply with applicable governmental laws, rules and regulations; and

•     Promptly report any violations of this Code of Business Ethics to our Chief Legal Officer or Audit Committee.  [Emphasis added].

39.     Under the heading "Honest and Ethical Conduct," the Code provides that each director, officer, and employee must "observe both the form and spirit of laws and governmental rules and regulations and accounting standards; and adhere to a high standard of business ethics."

40.     Under the heading "Disclosure," the Code provides:

Each director, officer or employee, to the extent involved in the Company's disclosure process, including without limitation the Senior Financial Officers, must:

11

- familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company; and

- ***not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations***. [Emphasis added].

41.     Under the heading "Compliance," the Code provides:

It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each employee, officer and director to adhere to the standards and restrictions imposed by those laws, rules and regulations in the performance of their duties for the Company, ***including those relating to accounting and auditing matters and insider trading.***

***Generally, it is against Company policy for any individual to profit from undisclosed information relating to the Company or any other company in violation of insider trading or other laws. Anyone who is aware of material nonpublic information relating to the Company, our customers, or other companies may not use the information to purchase or sell securities in violation of the federal securities laws***. [Emphasis added].

42.     In violation of the Code's provisions concerning honest and ethical conduct, disclosure, and compliance, the Company's directors allowed SBTech to continue to engage in the Illicit Operations through its relationship with BTi/CoreTech, and they failed to disclose the failure of the Company's compliance policies and resulting unlawful conduct to the Company's shareholders and the investing public.

## **BACKGROUND**

43.     Defendants caused the Company's predecessor, Old DK, and DEAC to merge with SBTech, despite SBTech's long and ongoing record of operating unlawfully in markets where online gambling is restricted (the "Illicit Operations") and failed to ensure the cessation or disclosure of the Illicit Operations following the Merger.  In addition to engaging in or causing the Company to engage in the Illicit Operations, Defendants made or caused the Company to make materially false and/or misleading statements that failed to disclose the Illicit Operations and the heightened risks the Company faced as a result of SBTech's engaging in the Illicit Operations.

44.     Prior to the Merger, DEAC was a SPAC, also known as a "blank check company," created for the purpose of acquiring a private company and taking it public through a merger. DEAC

consummated an initial public offering on May 14, 2019.  Old DK was a digital sports entertainment and gaming company known for its daily fantasy sports and mobile sports betting platforms.  SBTech, a company limited by shares, incorporated in Gibraltar and continued as a company under the Isle of Man Companies Act 2006 and based in Bulgaria, was a global provider of business-to-business technology for sports betting, trading services, and marketing and bonus tools for sports betting and online gaming brands.

**FALSE AND MISLEADING STATEMENTS**

45.   The Relevant Period begins on December 23, 2019, when the Company issued a press release, filed by DEAC on a Current Report on Form 8-K with the SEC that same day, announcing the Business Combination. That press release made the following representations regarding SBTech:

**SBTech Highlights**

- SBTech is a premier global full-service B2B turnkey technology provider with omni-channel sports betting solutions, trading services, and marketing and bonus tools powering some of the world's most popular sports betting and online gaming brands.

- 50+ partners in 20+ regulated markets and jurisdictions including Czech Republic, Denmark, Ireland, Italy, Mexico, Portugal, Spain, Sweden, and U.K. and Arkansas, Indiana, Mississippi, New Jersey, Oregon and Pennsylvania in United States.

- Awarded exclusive contract offering mobile and retail sports betting for the Oregon state lottery with their Oregon Lottery Scoreboard brand.

"The combination of DraftKings and SBTech brings together two tech-native companies with the customer at their cores," said Gavin Isaacs, SBTech's Chairman. "SBTech will maintain its core business and continue its B2B focus. We are excited about the opportunity to join a company with a similar innovation DNA and create a unique and differentiated player in global sports betting and online gaming."

46.   That same day, DEAC filed a Current Report on Form 8-K with the SEC, appended to which as an exhibit was the transcript of an investor call to discuss the Business Combination.  During the call, Defendant Robins touted SBTech:

Number three, the combination with SBTech, who is the leading B2B innovator in sports technology, powering some of the world's most popular sports betting and online gaming brands, creates a unique, vertically integrated, customer focused U.S. market opportunity.

\*     \*     \*

> Layering in SBTech, the industry leader in B2B sport's technology, strengthens us and creates a unique, vertically integrated company in the category. solution. They have a proven track record of outperformance versus industry peers on both growth and margin. The ***company has a global footprint with material new opportunities emerging in the U.S., Europe, Africa, Latin America, and Asia***. [Emphasis added].

47.     On January 13, 2020, DEAC filed a Current Report on Form 8-K with the SEC, appended to which as an exhibit was an investor presentation (the "January 2020 Investor Presentation"). The January 2020 Investor Presentation described DraftKings and SBTech as a "fully integrated platform that enables DraftKings' mission," and touted SBTech as a "leader in online gaming technology" that is "[p]ositioned as one of the fastest growing tech firms within sports betting, with an ***omni-channel solution***," and has a ***"[p]roven track record of outperformance*** vs. industry peers on growth and margin" and a ***"[g]rowing global footprint*** with material new opportunities emerging in Europe, U.S., Africa, Latin America, and Asia."  (Emphasis in original).

48.     On March 5, 2020, DEAC filed a Current Report on Form 8-K with the SEC, appended to which as an exhibit was the transcript of an interview given by Defendant Robins on March 3, 2020 at the Morgan Stanley Technology, Media & Telecom Conference. During the interview, Defendant Robins stated:

> I think for us there were really three objectives that we were trying to solve for. And the way we approach anything at the company, including something like how do we capitalize the business, what's the best financing route, is we start with what are we trying to accomplish and then what is the most effective way to accomplish that. Seems simple enough.  So the three things we were trying to accomplish were we had identified this company, SBTech, which we felt was a really important part of the full product that we needed to build out and we thought this was a great opportunity to really add the one piece we thought we were missing on the technology and product side.

49.     On March 12, 2020, the Company issued a press release reporting its full year 2019 results:

> "This was a transformative year for DraftKings. We further established ourselves as a leader in the rapidly evolving digital sports and gaming industry, launched products in six new states and announced a business combination with Diamond Eagle and SBTech to become a public company," said Jason Robins, co-founder and Chief Executive Officer of DraftKings. "I am excited to have closed out 2019, having achieved net revenue of $323M for the full year, a 43% increase over 2018."
>
> *     *     *
>
> Upon close of the business combination, DraftKings will become the only vertically-integrated pure-play sports betting and online gaming company based in the United States. Through the business combination, DraftKings expects to realize synergies by transitioning its risk and trading sports betting platform to SBTech's, instead of

relying on a third-party platform. In addition to reducing costs, DraftKings will control its backend system and product roadmap, differentiating the company from other U.S. operators and giving it the ability to tailor its sports betting product to U.S. sports and users.

50.     On April 23, 2020, the Company issued a press release entitled "DraftKings Closes Business Combination and Will Begin Trading on the Nasdaq Stock Exchange."  The press release stated:

> "Today marks another milestone for DraftKings and the future of digital sports entertainment and gaming in America," said Jason Robins, co-founder and CEO of DraftKings. "By bringing together our leading consumer brand, data science expertise and industry-leading products with SBTech's proven technology platform, we will accelerate our innovation, growth and scale. I am confident that the new DraftKings will progress our goal of offering the best, most innovative sports and gaming products to our customers."

51.     On April 27, 2020, the Company filed a Prospectus on Form 424B3 with the SEC (the "April 27, 2020 Prospectus").  The April 27, 2020 Prospectus stated:

> Following the consummation of the Business Combination with SBTech, we also plan to expand our offerings to begin serving other operators within our industry. We will begin by migrating DraftKings' own consumer offering onto SBTech's proprietary sports betting platform over time, allowing us to become a fully vertically integrated sports betting operator. We will also leverage the combined entity's shared infrastructure to service adjacent branded operators in both the United States and internationally at greater scale. This could include online sportsbooks, retail sportsbooks, iGaming operators, as well as governments or lotteries seeking to manage their own sportsbook or iGaming offerings. SBTech offers one of the industry's most robust platform solutions to satisfy its customers' sports betting technology needs, ranging from trading and risk management to platform services to support reporting, customer management and regulatory reporting requirements. SBTech competes with a variety of other sports betting technology providers and differentiates itself through this full suite platform offering. In addition, SBTech offers a leading iGaming solution via its proprietary platform with integrations to third-party iGaming suppliers.

52.     Further, the April 27, 2020 Prospectus listed as one of the Company's "Core Operating Principles":

> Act responsibly. We are committed to industry-leading responsible gaming practices and seek to provide our users with the resources and services they need to play responsibly.  We have invested in processes that identify and protect vulnerable users. Specifically, we created an internal, independent "Game Integrity and Ethics Team" that actively monitors for any indication of activities that may violate current regulations governing us, our own terms of use or our "Community Guidelines." This team oversees a framework for our user community to follow in determining

1    when a user may need assistance. With our focus on fair and responsible gaming
2    along with user protection and data security, users have come to know and trust our
     gaming platform.

3        53.    With respect to compliance, the April 27, 2020 Prospectus stated:

4    Underpinning our regulatory access is our DraftKings platform that allows us to
5    efficiently and safely scale our product offerings into multiple jurisdictions. We have
     developed our DraftKings platform from the ground up to meet the needs of the
6    unique regulatory environment that the United States offers, while maintaining ease
7    of use for our users. We provide a single experience for login, verification and
     wallet.

8    SBTech's platform has been built from the ground up to meet the needs of differing
9    regulatory regimes, including configurable regulatory and responsible gaming
     controls such as responsible gaming tests, operator alerts on player behavior, deposit
10   limits, betting limits, loss limits, timeout facilities, session limits, reality checks,
     balance thresholds and intended gaming amounts. These features allow the operators'
11   customers full control of their gaming to allow them to play responsibly.

12       54.    On May 13, 2020, the Company filed a Prospectus on Form 424B3 with the SEC (the

13   "May 13, 2020 Prospectus"). The May 13, 2020 Prospectus contained substantively similar statements

14   as those included in the April 27, 2020 Prospectus.

15       55.    On May 15, 2020, the Company issued a press release reporting its Q1 2020 results:

16   Through its recent business combination, DraftKings has created the only vertically
     integrated sports betting company based in the United States.

17   "We are uniquely positioned at the intersection of digital sports entertainment and
18   gaming in a rapidly growing industry," said Jason Robins, DraftKings co-founder,
     CEO and Chairman of the Board. "DraftKings recorded standalone Q1 year over
19   year revenue growth of 30% despite the effects of COVID-19. Additionally, the
     engagement we continue to see from our customers validates the connection they
20   have with our content, their passion for our products and most importantly their
     loyalty to our brand."

21

22       56.    That same day, the Company hosted an earnings call with investors and analysts to

23   discuss the Company's Q1 2020 results (the "Q1 2020 Earnings Call"). During the scripted portion of

24   the Q1 2020 Earnings Call, Defendant Robins stated: "[t]hrough the acquisition of SBTech, we have

25   created the only vertically integrated sports betting company in the U.S., enabling us to be the product

26   innovation leader for American sports, with a clear focus on the American sports fan." Further, during

27   the scripted portion of the Q1 2020 Earnings Call, Defendant Park stated:

28   ///

16

Starting with Old DraftKings, despite COVID we generated $89 million of net revenue in the quarter, which is an increase of 30% versus prior year. Notably pre-COVID prior to March 11, our revenue was up 60% versus prior year. These results are due to our strategy of launching in new states, as well as growing revenue in existing states. In this quarter, we were live in five new states for online sports betting, versus the first quarter of 2019, Indiana, Iowa, New Hampshire, Pennsylvania, and West Virginia.

*     *     *

Now turning to SBTech. Old SBTech revenue generated €22.6 million, an increase of 3% versus Q1 2019. Notably, pre-COVID, prior to March 11, our revenue was up 19% versus prior year. Adjusted EBITDA was negative €851,000 versus prior year of positive €4.3 million. SBTech was well on track to achieve positive EBITDA for the quarter, until COVID hit. And we anticipate to return to profitability once the major sports resume.

57.     On June 22, 2020, DraftKings filed a Prospectus on Form 424B4 with the SEC (the "June 22, 2020 Prospectus").  The June 22, 2020 Prospectus contained substantively similar statements as those included in the April 27, 2020 Prospectus.

58.     On August 14, 2020, the Company issued a press release entitled "DraftKings Reports Strong Q2 Revenue Despite Limited Sports Calendar."  The press release stated:

DraftKings [. . .] today reported financial results for the second quarter of 2020. For the three months ended June 30, 2020, DraftKings reported GAAP revenue of $71 million compared to $57 million during the same period in 2019. On a pro forma basis, including the effect of the Company's business combination with SBTech (Global) Limited and Diamond Eagle Acquisition Corp. as if it had been completed on January 1, 2019, revenue would have been $75 million in the second quarter of 2020, compared to $83 million during the same period in 2019. DraftKings ended the second quarter of 2020 with over $1.2 billion in cash and no debt on its balance sheet.

"We believe that the best product will ultimately win with the American consumer," said Jason Robins, DraftKings Co-Founder, CEO and Chairman of the Board.  "As a technology first organization, we will continue to focus on bringing new and innovative products to market that strengthen our engagement with customers and maintain our competitive differentiation."

59.     That same day, the Company hosted an earnings call with investors and analysts to discuss the Company's Q2 2020 results (the "Q2 2020 Earnings Call").  During the scripted portion of the Q2 2020 Earnings Call, Defendant Robins stated:

We had a strong second quarter given the limited sports calendar with second quarter pro forma revenue of $75 million. As sports have started to return, we saw revenue improve sequentially each month in the quarter, with June revenue increasing 20%

year-over-year on a pro forma basis.  This strong overall results and improvement are due to our product innovation, our entry into new jurisdiction, and pent-up demand for sports betting as Live Sports like Golf, European Soccer, NASCAR and UFC started to return.

60.     On October 8, 2020, the Company filed a Prospectus on Form 424B4 with the SEC (the "October 8, 2020 Prospectus").   The October 8, 2020 Prospectus contained substantively similar statements as those included in the April 27, 2020 Prospectus.

61.     On November 13, 2020, the Company issued a press release reporting the Company's Q3 2020 results and raising its 2020 revenue guidance.  The press release stated:

DraftKings [. . .] today reported its financial results for the third quarter of 2020. For the three months ended September 30, 2020, DraftKings reported revenue of $133 million, an increase of 98% compared to $67 million during the same period in 2019. After giving pro forma effect to the business combination with SBTech (Global) Limited and Diamond Eagle Acquisition Corp., as if it had occurred on January 1, 2019, revenue grew 42% compared to the three months ended September 30, 2019.

"The resumption of major sports such as the NBA, MLB and the NHL in the third quarter, as well as the start of the NFL season, generated tremendous customer engagement," said Jason Robins, DraftKings' co-founder, CEO and Chairman of the Board. "In addition to our year-over-year pro forma revenue growth of 42%, DraftKings recorded an increase in monthly unique payers of 64% to over 1 million, demonstrating the effectiveness of our data-driven sales and marketing approach.

Our product offerings and scalable platform provide a distinctive and personalized experience for customers across the ten states where we operate mobile sports betting today, and we look forward to entering additional jurisdictions at the earliest opportunity."

62.     That same day, the Company hosted an earnings call with investors and analysts to discuss the Company's Q3 2020 results (the "Q3 2020 Earnings Call").  During the scripted portion of the Q3 2020 Earnings Call, Defendant Robins stated:

DraftKings had a very productive third quarter on a number of different fronts.  First, our Q3 performance confirms what we foreshadowed on our previous earnings call. The return on major sports has generated tremendous customer engagement. Third quarter revenue of $133 million was at the high end of the range we outlined in our recent S-1 and grew 42% year-over-year.  In Q3, we also had more than 1 million monthly unique payers, which means the average for the month of July, August and September was greater than 1 million.

*     *     *

We continue to be very excited with the products and technology investments we're making as well as with our progress on the technology migration and business integration of SBTech.

18

*    *    *

As a reminder, with the acquisition of SBTech, we now have almost 1,100 engineers worldwide dedicated to creating best-in-class technology and games and experiences for our users.

63.     On February 26, 2021, the Company filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K also touted SBTech's business:

B2B Business Marketing - Our core B2B marketing strategy is centered around attending and exhibiting at major trade shows around the world. SBTech's trade show marketing is supplemented with digital and offline marketing campaigns in leading industry publications, websites, regular media pieces and participation on industry panels. SBTech's reputation and customer testimonials also assist in its marketing and business efforts. (Emphasis in original).

64.     The 2020 10-K also touted the Company's compliance program:

We have developed and implemented an internal compliance program to help ensure that we comply with legal and regulatory requirements imposed on us in connection with our DFS, Sportsbook and iGaming activities. Our compliance program focuses on, among other things, reducing and managing problematic gaming and providing tools to assist users in making educated choices related to gaming activities.

SBTech offerings have been built from the ground up to meet the needs of differing regulatory regimes, including configurable regulatory and responsible gaming controls such as responsible gaming tests, operator alerts on player behavior, deposit limits, betting limits, loss limits, timeout facilities, session limits, reality checks, balance thresholds and intended gaming amounts.   These features allow the operators' customers full control of their gaming to allow them to play responsibly.

65.     Appended to the 2020 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Robins and Park, attesting that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

66.     Corresponding with the 2020 10-K, the Company issued a press release announcing the Company's fourth quarter and full year 2020 results and raising its 2021 revenue guidance. The press release stated:

For the three months ended December 31, 2020, DraftKings reported revenue of $322 million, an increase of 146% compared to $131 million during the same period in 2019. After giving pro forma effect to the business combination with SBTech (Global) Limited ("SBTech") and Diamond Eagle Acquisition Corp. which was

completed on April 23, 2020, as if it had occurred on January 1, 2019, revenue grew 98% compared to the three months ended December 31, 2019.

"With a favorable fourth quarter sports calendar and strong marketing execution, DraftKings was able to generate tremendous customer acquisition and engagement that propelled us to $322 million in fourth quarter revenue, a 98% year over year increase," said Jason Robins, DraftKings' co-founder, CEO and Chairman of the Board. "In the fourth quarter of 2020, we saw MUPs increase 44% to 1.5 million and ARPMUP increase 55% to $65. We are raising our revenue outlook for 2021 due to our expectation for continued growth, the outperformance of our core business and newly launched states that were not included in our previous guidance."

67.    That same day, the Company hosted an earnings call with investors and analysts to discuss the Company's Q4 2020 results (the "Q4 2020 Earnings Call").  During the scripted portion of the Q4 2020 Earnings Call, Defendant Robins stated:

Our list of accomplishments in 2020 is impressive.  We completed the business combination with SBTech and became a publicly traded company in April. We are well on our way to completing the integration of the two companies from a team organization and business standpoint, and are progressing with the migration to our own in-house sports betting engine, which we expect will be complete by the end of the third quarter in 2021.

*    *    *

We exceeded our expectations in 2020. Pro forma revenue grew nearly 50% to $644 million versus $432 million last year.  Both MUPs and ARPMUP grew 29% in 2020. We had a strong close to the year with Q4 revenue growing almost 100% year-over-year, and MUPs and ARPMUP growing 44% and 55%, respectively, in the quarter.

Revenue for the year was almost $95 million higher than the midpoint of our guidance.  These results were due to overperformance in our core business as well as multiple assumptions on external factors that broke our way, such as the sports calendar, the extension of mobile registration, Illinois and better-than-expected whole percentage in online sports book.

68.    On May 7, 2021, the Company issued a press release reporting its Q1 2021 results and raising its 2021 revenue guidance.  The press release stated:

For the three months ended March 31, 2021, DraftKings reported revenue of $312 million, an increase of 253% compared to $89 million during the same period in 2020. After giving pro forma effect to the business combination with SBTech (Global) Limited ("SBTech") and Diamond Eagle Acquisition Corp. which was completed on April 23, 2020, as if it had occurred on January 1, 2019, revenue grew 175% compared to the three months ended March 31, 2020.

"DraftKings is off to an outstanding start in 2021," said Jason Robins, DraftKings' co-founder, CEO and Chairman of the Board.  "We continued to make progress and

remain on track with the migration to our own in-house proprietary sports betting engine, strengthened our content and technology capabilities with the acquisitions of VSiN and BlueRibbon Software, and invested in further differentiating our product offering with the upcoming rollout of social functionality in our DFS and mobile Sportsbook apps."

Jason Park, DraftKings' Chief Financial Officer, added, "Our $312 million in first quarter revenue, 114% increase in MUPs and 48% growth in ARPMUP reflect solid customer acquisition and retention as well as successful launches of mobile sports betting and iGaming in new states. We are raising our revenue outlook for 2021 due to the outperformance of our core business in the first quarter and our expectation for continued healthy growth."

69.    That same day, the Company hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call"). During the scripted portion of the Q1 2021 Earnings Call, Defendant Robins stated:

DraftKings is off to an outstanding start in 2021. Revenue for the first quarter increased 175% year-over-year to 312 million on a pro forma basis. MUPs grew 114% and ARPMUP grew 48%. These results reflect continued over performance of our core business due to strong customer acquisition and retention as well as the successful launches of mobile sports betting and iGaming in Michigan and mobile sports betting in Virginia.

70.    The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that: (i) SBTech had a history of unlawful operations; (ii) accordingly, DraftKings' merger with SBTech exposed the Company to dealings in black-market gaming; (iii) the foregoing increased the Company's regulatory and criminal risks with respect to these transactions; (iv) as a result of all the foregoing, the Company's revenues were derived, in part, from unlawful conduct and thus unsustainable; (v) accordingly, the benefits of the Business Combination were overstated; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

### THE TRUTH EMERGES

71.    On June 15, 2021, Hindenburg published a report entitled "DraftKings: A $21 Billion SPAC Betting It Can Hide Its Black Market Operations." The report alleged that the Company's merger with SBTech exposed DraftKings to dealings in black-market gaming. Specifically, the report stated:

///

- SBTech accounted for ~25% of total revenue at the SPAC consummation and was the only positive contributor to operating income, providing both financial stability and technology to the deal.

- Unbeknownst to investors, DraftKings' merger with SBTech also brings exposure to extensive dealings in black-market gaming, money laundering and organized crime.

- Based on conversations with multiple former employees, a review of SEC & international filings, and inspection of back-end infrastructure at illicit international gaming websites, we show that SBTech has a long and ongoing record of operating in black markets.

- We estimate that roughly 50% of SBTech's revenue continues to come from markets where gambling is banned, based on an analysis of DraftKings' SEC filings, conversations with former employees, and supporting documents.

\*     \*     \*

- We identified numerous black market clients of DraftKings' "front" entity, through searches on social media and back-end web infrastructure.

\*     \*     \*

- DraftKings trades at a ~26x last twelve months (LTM) sales multiple and a ~20x estimated 2021 sales multiple despite (i) no expectation of earnings, for years, (ii) intense competition, and (iii) regulatory risk. The company posted net losses of $844 million in 2020 and $346 million last quarter.

- Insiders have dumped over $1.4 billion in stock since the company went public a little over a year ago, with SBTech's founder leading the pack, having personally sold ~$568 million in shares.

\*     \*     \*

- We think DraftKings has systematically skirted the law and taken elaborate steps to obfuscate its black market operations. These violations appear to be continuing to this day, all while insiders aggressively cash out amidst the market froth.

72.     The Hindenburg report also explained that SBTech entered into Asian black markets in 2014.  The report stated:

According to former employees, SBTech's offering struggled to compete against competitors like Kambi, which had a robust team dedicated to analyzing and setting "in-game" betting odds and had more powerful technology. The competition pushed SBTech to seek business in markets where others were unwilling to operate, we were told.

Despite the illegality of sports gambling in major Asian markets, SBTech's own marketing materials suggest it had an expansive Asia-facing business at least as far

22

back as 2014. SBTech's website at the time advertised a "powerful turnkey Asian system" that accepted payment in currencies where gambling was clearly illegal.

\*    \*    \*

Specifically, according to the graphic on its website, SBTech accepted Vietnamese, Dong and Indonesian Rupees – both currencies based in black market sports gambling jurisdictions.

73.    The Hindenburg report continued to explain that the owner of SBTech spun out certain of his gambling operations to set up a front entity to mask SBTech's involvement in black and unregulated markets:

According to a former business partner of SBTech, the prospect of doing business in the U.S. was the trigger for SBTech owner Shalom Meckenzie to spin out certain of his gambling operations to at least two separate entities. The entities were placed under the control of relatives or trusted confidantes and run by many of the same staff.

Shortly after the Supreme Court hearing, on March 19, 2018, SBTech announced that Tom Light, the SVP of business development, was leaving to create a "new blockchain and gambling venture".

\*    \*    \*

The venture was unnamed in the press release, but Maltese and Bulgarian corporate records show that Light began creating an entity called BTi days later. [1,2,3] It was later renamed CoreTech.

One former employee who served in a product development role told us BTi/CoreTech was a "front" for SBTech's illegal or unregulated markets:

"Before SBTech joined with DraftKings, they split the grey market/unregulated…they [Bti] are a separate company marketing their white label solution to Middle East, South America, mostly China and Malaysia. Their technology provider is SBTech. Because SBTech is now on NASDAQ they don't want Asia or the grey market to give it a bad influence. They want to be clean."

The same former employee told us that BTi/CoreTech acted as a customer of SBTech, which invoiced BTi/CoreTech, in an apparent effort to put a layer of legal separation between SBTech and its black market end customers.m A second former employee, who worked as a data specialist at SBTech for several years, described BTi/CoreTech similarly. When asked how much of BTi/CoreTech's revenue comes from black or grey markets he said: "I would say almost all of it. Well over 90%"

Despite the small legal market in Asia, DraftKings states in its SEC filings that an unnamed customer focused on Asian markets accounted for 46% of SBTech's 2019 revenue and 52% of SBTech's 2020 revenue, but failed to disclose the name of the customer.[1] [Pg. 39, Pg. 40]

When asked about this, the former employee speculated "…if it's Asia it will have to be (BTi)…it must be through BTi". To be clear, SBTech has several Asiafacing customers and "resellers" such as 10Bet, W88, and Gameplay, as we detail further.

The opacity of DraftKings' customer relationship disclosures has thus far masked the names of its top customers.

The implication either way is that black and unregulated market revenue and profitability, which includes BTi/CoreTech, represented and still represents a major portion of SBTech's financials since DraftKings went public.

The former employee added that the new focus on adding blockchain to the gambling offering was because operators in black markets had requested cryptocurrency options to make moving money easier. Crypto has emerged as the medium of choice for illicit money transfers, given the lack of oversight. BTi/CoreTech was set up across town from SBTech's office in Sofia, Bulgaria, 4.5 miles (7.2 km) away, per Bulgarian corporate records. (Emphasis in original.)

74. Further, the Hindenburg report explained that, despite SBTech's claims it was separate from BTi/CoreTech, multiple employees and customers described BTi/CoreTech as either an affiliate or subsidiary of SBTech, or used the name BTi interchangeably with SBTech. For example, the Hindenburg report stated:

Despite the ostensible separation, many employees seemed to be under the impression that they worked for SBTech.

This includes BTi/CoreTech's current CEO, Amir Vaknin (who, according to his LinkedIn, never worked for SBTech). Nonetheless, he announced he was searching to hire employees for SBTech around the time that BTi/CoreTech was formed.

75. The Hindenburg report also indicated that Hindenburg was able to corroborate accounts by former employees who claimed that "the renaming and re-branding of parts of SBTech to BTi to CoreTech – was an effort to separate the entity's 'behind the scenes' black market operations to pave the way for a U.S. deal partner like DraftKings', with its polished and clean exterior." Specifically, the Hindenburg report provided a number of corroborating examples:

Example 1: BTi's Sportsbook Is Advertised Through a Site Linked To A Recent Raid on An Alleged Illegal Operator in Thailand

*    *    *

Example 2: 12Bet, A Site Tied To Triads And At The Center Of A Swiss Money Laundering Investigation, Advertises Its Use of BTi's Technology

*    *    *

24

Example 3: Gaming Site Fun88, Linked To An Illegal Gaming Raid In Vietnam, Also Advertises Its Use of BTi's Platform

\*     \*     \*

Example 4: SBTech Claimed to Oregon Regulators That Its Customer 10Bet Did Not Derive Revenue From China (A Major Black Market) Using SBTech's Software

We Found Multiple Chinese-Facing 10Bet Sites Where Backend Web Infrastructure Demonstrates SBTech's Involvement

\*     \*     \*

Example 4 (Cont'd): 10bet, A Sports Betting Firm With Apparent Ongoing Operations in China, Was Launched By SBTech Founder Shalom Meckenzie In Mid-2018, Meckenzie Stepped Down From 10Bet And Transferred His Shares to His Brother To (Once Again) Obfuscate The Connection DraftKings Continues to Do Business With the Entity, Per Its SEC Filings

\*     \*     \*

Example 5: SBTech Operated in Iran For Years, According to Multiple Former Employees, Contrary to Its Representations to Oregon State Regulators

76.     In its conclusion, the Hindenburg report further elaborated on SBTech's unlawful activity:

One issue with partnering with black market betting operators is that such businesses are not just engaged in illegal betting. These operators almost by definition are engaged in money laundering, and often additional lines of underground business activity.

As one former employee told us succinctly, SBTech founder Meckenzie and his affiliate entities have "sold to plenty of mobs".

The same former employee explained that DraftKings and its SPAC sponsors must have either known the issues with SBTech's black market operations or were grossly negligent in their diligence:

"I would be really, really, really surprised if they didn't know. In fact, it would be really, really amateur of them if they didn't investigate that.

Presumably they knew and […] helped facilitate hiding it or turned a blind eye to it… but they must have known."

DraftKings has never identified the nature of its BTi/CoreTech relationship in any of its SEC filings – not as an affiliate or subsidiary of SBTech or in any other way as relevant to DraftKings' SPAC combination with SBTech. It also has not provided transparency regarding the markets SBTech and its other "resellers" and affiliates operate in, and their respective contributions to the public company.

> Given the importance of SBTech to DraftKings' top and bottom-line, it is virtually impossible to fathom that DraftKings was and continues to remain unaware of its ongoing relationship with BTi/CoreTech and its illicit operators.
>
> Yet rather than disclose anything about these relationships, the company instead appears to have created a complex web of misinformation to conceal them. (Emphasis in original.)

77.     Following publication of the Hindenburg report, the Company's stock price fell $2.11 per share, or 4.17%, to close at $48.51 per share on June 15, 2021.

## DAMAGES TO THE COMPANY

78.     As a direct and proximate result of Defendants' misconduct, the Company has lost and will continue to lose and expend many millions of dollars.

79.     Such expenditures include, but are not limited to, the fees associated with the Securities Class Actions filed against the Company, its CEO and CFO, and DEAC's former CEO and CFO; defending against the SEC subpoena and any internal investigations; and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

80.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to Defendants who breached their fiduciary duties to the Company.

81.     As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DUTIES OF THE DIRECTOR DEFENDANTS

82.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

///

83.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

84.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

///

///

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

85.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

86.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Director Defendants.

88.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

89.     During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Robins, Sloan, Kalish, Liberman, Levin, Meckenzie, J. Moore, R. Moore, Mosley, Murray, Nada, Salter and Walden.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

90.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

91.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

92.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

93.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

94.     Each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

95.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while seven of them conducted insider sales for proceeds of approximately $825.3 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

### *Defendant Robins*

96.     Because of his CEO management position with the Company, Defendant Robins is not independent.

97.     The Company provides Defendant Robins with his principal occupation, and he receives handsome compensation for his services.  Defendant Robins was responsible for most of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on.

98.     Defendant Robins is also a defendant in the securities class actions entitled *Hoorn v. DraftKings Inc., et al.*, Case 1:21-cv-06497 (S.D.N.Y.) and *Rodriguez v. DraftKings Inc., et al.*, Case 1:21-cv-05739 (the "Securities Class Actions") and faces a substantial likelihood of liability; therefore, demand on Defendant Robins is futile.

**Defendant Kalish**

99.     Defendant Kalish cofounded Old DK in 2011 and served as its Chief Revenue Officer from 2014 to 2019, after which he was appointed President, DraftKings North America. As the Company admits, he is a non-independent director.  The Company provides Defendant Kalish with his principal occupation for which he receives significant compensation, including over $197,235,333 in compensation for the 2020 Fiscal Year alone.  Before the truth emerged regarding the Illicit Operations, Defendant Kalish sold $3,110,175.72 of Company stock at artificially inflated prices based on inside information.

**Defendant Levin**

100.     Defendant Levin served as a director of Old DK from December 2013 until the Merger and thus contributed to the consummation of the Merger, which exposed the Company to the Illicit Operations.  Defendant Levin is currently a member of the Nominating and Corporate Governance Committee.  Defendant Levin received and continues to receive substantial compensation for his service on the Board, including $375,893 in the 2020 Fiscal Year.

**Defendant Liberman**

101.     Defendant Liberman cofounded Old DK in 2011 and served as its Chief Operations Officer from 2015 until December 2019, when he was appointed President, Global Technology and Product.  The Company admits that he is a non-independent director.  Defendant Liberman currently sits on the Compliance Committee.  The Company provides Defendant Liberman with his principal occupation for which he receives handsome compensation, including $197,220,479 in compensation

1   for the 2020 Fiscal Year alone.  Before the truth emerged regarding the Illicit Operations, Defendant

2   Liberman sold $4,574,700 of Company stock at artificially inflated prices based on inside information.

3   **Defendant Meckenzie**

4       102.    Defendant Meckenzie is the founder of SBTech and served as its director until May

5   2014.  Defendant Meckenzie also served as a member of the board of directors of a subsidiary of

6   SBTech from 2003 until 2018.  The Company admits that he is a non-independent director. Defendant

7   Meckenzie currently serves as a member of the Compensation Committee, and he received and

8   continues to receive substantial compensation for his service on the Board, including $373,618 in the

9   2020 Fiscal Year.   SBTech's engagement in the Illicit Operations and its involvement with

10   BTi/CoreTech form the core of the allegations in this complaint, and therefore Defendant Meckenzie,

11   due to his longstanding history with SBTech, cannot dispassionately investigate the allegations made

12   herein.  Further, companies owned by Defendant Meckenzie or his brother have repeatedly engaged in

13   related-party transactions with SBTech, making it exceedingly unlikely that Defendant Meckenzie

14   would launch any investigation into the Illicit Operations with the potential to expose how Defendant

15   Meckenzie has profited at SBTech's expense.  Moreover, before the truth emerged regarding the Illicit

16   Operations, Defendant Meckenzie sold $387,403,543 of Company stock at artificially inflated prices

17   based on inside information.

18   **Defendant J. Moore**

19       103.    Defendant J. Moore currently serves as a member of the Nominating and Corporate

20   Governance Committee, the Compliance Committee, and the Compensation Committee.  Defendant

21   Moore received and continues to receive substantial compensation for her service on the Board,

22   including $199,979 in the 2020 Fiscal Year.   As a trusted Company director with significant

23   responsibilities on Board committees, she conducted little, if any, oversight of the scheme to cause the

24   Company to make false and misleading statements, consciously disregarded her duties to monitor

25   internal controls over reporting and engagement in the scheme, and consciously disregarded her duties

26   to protect corporate assets.  For these reasons, Defendant J. Moore breached her fiduciary duties, faces

27   a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is

28   futile and, therefore, excused.

**Defendant R. Moore**

104.    Defendant R. Moore currently serves as a member of the Audit Committee and the Compensation Committee.   Defendant R. Moore received and continues to receive substantial compensation for his service on the Board, including $376,790 in the 2020 Fiscal Year.  Before the truth emerged regarding the Illicit Operations, Defendant R. Moore sold $50,830,000 of Company stock at artificially inflated prices based on inside information.

**Defendant Mosley**

105.    Defendant Mosley currently serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.  Defendant Mosley received and continues to receive substantial compensation for her service on the Board, including $199,979 in the 2020 Fiscal Year.

**Defendant Murray**

106.    Defendant Murray currently serves as a member of the Audit Committee.  Defendant Murray received and continues to receive substantial compensation for his service on the Board, including $378,136 in the 2020 Fiscal Year.  Before the truth emerged regarding the Illicit Operations, Defendant Murray sold $78,579,316 of Company stock at artificially inflated prices based on inside information.

**Defendant Nada**

107.    Defendant Nada currently serves as a member of the Audit Committee and the Compensation Committee.   Defendant Nada received and continues to receive substantial compensation for his service on the Board, including $394,656 in the 2020 Fiscal Year.  Before the truth emerged regarding the Illicit Operations, Defendant Nada sold $48,121,370.96 of Company stock at artificially inflated prices based on inside information.

**Defendant Salter**

108.    Defendant Salter currently serves as a member of the Compliance Committee. Defendant Salter received and continues to receive substantial compensation for his service on the Board, including $389,836 in the 2020 Fiscal Year.  Before the truth emerged regarding the Illicit

///

1  Operations, Defendant Salter sold $252,755,834 of Company stock at artificially inflated prices based

2  on inside information.

3  **Defendant Sloan**

4      109.    Defendant Sloan was a founding investor of DEAC and currently serves as Vice

5  Chairman of the Company's Board, in addition to being a member of the Board's Nominating and

6  Corporate Governance Committee.  Defendant Sloan received and continues to receive substantial

7  compensation for his service on the Board, including $375,445 in the 2020 Fiscal Year.  Defendant

8  Sloan has cofounded seven SPACs with his partners, raising aggregate gross proceeds of over $4

9  billion.  He was also a leading orchestrator of the Merger and is thus exceedingly unlikely to initiate an

10 investigation into the propriety of the Merger or any of the misconduct alleged herein.  Moreover, any

11 revelation that the Merger was tainted by misconduct would negatively affect Defendant Sloan's ability

12 to execute future SPAC deals, disrupting a business strategy that has proved to be enormously

13 profitable to him personally.

14 **Defendant Walden**

15     110.    Defendant Walden currently serves as a member of the Compliance Committee and the

16 Nominating and Corporate Governance Committee.  Defendant Walden received and continues to

17 receive substantial compensation for her service on the Board, including $375,445 in the 2020 Fiscal

18 Year.  As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the

19 Company to make false and misleading statements, consciously disregarded her duties to monitor

20 internal controls over reporting and engagement in the scheme, and consciously disregarded her duties

21 to protect corporate assets.  For these reasons, Defendant Walden breached her fiduciary duties, faces a

22 substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile

23 and, therefore, excused.

24     **ADDITIONAL REASONS THAT DEMAND ON THE BOARD IS FUTILE**

25     111.    Certain Defendants have longstanding business and personal relationships with each

26 other that preclude them from acting independently and in the best interests of the Company and the

27 shareholders.  For example, Defendants Robins, Kalish, and Liberman cofounded Old DK in December

28 2011.  Additionally, Defendants Robins, Kalish, Liberman, Meckenzie, Salter, Sloan all worked

1    together—along with Defendants Sagansky, Baker, and Park—to consummate the Merger.   In

2    particular, Defendants Meckenzie, Robins, and Sloan first met on June 15, 2019 as respective leaders of

3    SBTech, Old DK, and DEAC to initiate the plan that led to the April 2020 Merger.   Defendant Sloan

4    has cofounded seven SPACs with his business partners, which include Defendants Sagansky and

5    Baker, raising aggregate gross proceeds of over $4 billion.   Due to Defendant Sloan's substantial

6    history of highly profitable deals with Defendants Sagansky and Baker, Defendant Sloan is unlikely to

7    initiate suit against Defendants Sagansky and Baker.   These conflicts of interest precluded Defendants

8    from adequately monitoring the Company's operations and internal controls and calling into question

9    Defendants' conduct.   Thus, demand upon Defendants would be futile.

10   **Defendants R. Moore, Mosley, Murray and Nada**

11   112.    Defendants R. Moore, Mosley, Murray and Nada (the "Audit Committee Defendants")

12   served as members of the Audit Committee during the Relevant Period.   Pursuant to the Company's

13   Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, overseeing

14   and reviewing the Company's accounting and financial services, internal operating controls, and ethical

15   standards, as well as ensuring the independence of auditors, the integrity of management, and the

16   adequacy of disclosures to shareholders.   The Audit Committee Defendants failed to adequately

17   oversee the Company's reporting processes, failed to identify or remedy deficiencies with the

18   Company's internal controls, and failed prevent the Company from issuing false and misleading

19   financial statements with the SEC.   The Audit Committee Defendants breached their fiduciary duties,

20   are not disinterested, and demand is excused as to them.

21   **Defendants Liberman, Salter, and Walden**

22   113.    Defendants Liberman, Salter and Walden (the "Compliance Committee Defendants")

23   served as members of the Compliance Committee during the Relevant Period. Pursuant to the

24   Company's Compliance Committee Charter, the Compliance Committee Defendants are responsible

25   for, *inter alia*, reviewing and analyzing nonfinancial laws and regulations applicable to the Company

26   and taking steps to ensure the Company remains in compliance with such laws and regulations.   The

27   Compliance Committee Defendants failed to adequately oversee the Company's reporting processes,

28   failed to identify or remedy deficiencies with the Company's internal controls, and failed prevent the

1  Company from issuing false and misleading financial statements with the SEC.  The Compliance

2  Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as

3  to them.

4  **Defendants Kalish and Liberman**

5         114.    Demand in this case is further excused because the Defendants are beholden to and

6  controlled by Defendant Robins, who is cofounder, CEO, Chairman, and a controlling shareholder with

7  beneficial ownership of over 91.2% of the Company's voting power as of March 1, 2021.  As a result,

8  Defendants cannot impartially consider a demand against Defendant Robins, an interested, primary

9  wrongdoer, as they are dependent on him for their continued employment with the Company and the

10  lucrative compensation that goes with that; this is particularly true of Defendants Kalish and Liberman,

11  who are also executives at DraftKings.  Thus, Defendants, and in particular Defendants Kalish and

12  Liberman, are unable to evaluate a demand with disinterest or independence as a result of Defendant

13  Robins' control over them.

14  <u>**COUNT I**</u>

15
16  **(Against Defendants Robins, Park, Sagansky, and Baker For Violations Of <u>Sections 10(b) And 21D Of The Exchange Act)</u>**

17         115.    Plaintiff incorporates by reference and realleges each and every allegation contained

18  above, as though fully set forth herein.

19         116.    The Company and certain officers of the Company are named as defendants in the

20  Securities Class Action, which assert claims under the federal securities laws for violations of Sections

21  10(b) and 21D of the Exchange Act.  If and when the Company is found liable in the Securities Class

22  Actions for these violations of law, the Company's liability will be in whole or in part due to

23  Defendants Robins, Park, Sagansky, and Baker willful and/or reckless violations of their obligations as

24  officers and directors of the Company.

25         117.    Moreover, through their positions of control and authority as officers of the Company,

26  Defendants Robins, Park, Sagansky, and Baker were able to and did, directly and/or indirectly, exercise

27  control over the business and corporate affairs of the Company, including the wrongful acts described

28  in the Securities Class Action and herein.

118.    As such, Defendants Robins, Park, Sagansky, and Baker is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## COUNT II

### (Against The Director Defendants For Breach Of Fiduciary Duty)

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    The Director Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

121.    The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

122.    The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

123.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

124.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling

1  securities lawsuits and governmental investigations, severe damage to the share price of the Company's

2  stock, resulting in an increased cost of capital, and reputational harm.

3  ### COUNT III

4  ### (Against The Director Defendants For Waste Of Corporate Assets)

5  125.   Plaintiff incorporates by reference and realleges each and every allegation contained

6  above, as though fully set forth herein.

7  126.   The wrongful conduct alleged regarding the issuance of false and misleading statements

8  was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous,

9  connected, and ongoing harm to the Company.

10  127.   As a result of the misconduct described above, the Director Defendants wasted corporate

11  assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain

12  of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and

13  (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle

14  actions addressing Defendants' unlawful actions.

15  128.   As a result of the waste of corporate assets, the Director Defendants are liable to the

16  Company.

17  129.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

18  ### REQUEST FOR RELIEF

19  **WHEREFORE**, Plaintiff demands judgment as follows:

20  A.   Against all Defendants and in favor of the Company for the amount of damages

21  sustained by the Company as a result of Defendants' breaches of fiduciary duties;

22  B.   Directing the Company to take all necessary actions to reform and improve its corporate

23  governance and internal procedures to comply with applicable laws and to protect the Company and its

24  shareholders from a repeat of the damaging events described herein, including, but not limited to,

25  putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or

26  Articles of Incorporation and taking such other action as may be necessary to place before shareholders

27  for a vote a proposal to strengthen the Board's supervision of operations and develop and implement

28  procedures for greater shareholder input into the policies and guidelines of the Board;

1    C.    Awarding to the Company restitution from Defendants, and each of them, and ordering

2  disgorgement of all profits, benefits and other compensation obtained by Defendants;

3    D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable

4  attorneys' fees, accountants' and experts' fees, costs, and expenses; and

5    E.    Granting such other and further relief as the Court deems just and proper.

6                              **<u>DEMAND FOR TRIAL BY JURY</u>**

7        Plaintiff demands a trial by jury on all issues so triable.

8                            DATED this 21st day of October 2021.

9                            **MATTHEW L. SHARP, LTD.**

10

11                                    /s/ Matthew L. Sharp
                            Matthew L. Sharp, Esq.

12                            Nevada Bar No. 4746
                            432 Ridge St.

13                            Reno, NV 89501
                            Phone: (775) 324-1500

14                            Email: matt@mattsharplaw.com

15                            Thomas J. McKenna
                            Gregory M. Egleston

16                            **GAINEY McKENNA & EGESTON**
                            501 Fifth Avenue, 19th Floor

17                            New York, NY 10017
                            Phone: (212) 983-1300

18                            Fax: (212) 983-0383
                            Email: tjmckenna@gme-law.com

19                            Email: gegleston@gme-law.com

20                            ***Counsel for Plaintiff***

21

22

23

24

25

26

27

28

## VERIFICATION

I, JORDAN JOHN WALK, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ⎣8⎦ day of October 2021

_____
JORDAN JOHN WALK